# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>HARLEY DAVID GODFREY,<br><br>  Defendant. | No. CR07-4093-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

The defendant Harley David Godfrey is charged with possession of a firearm after previously being convicted of a felony drug crime, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* Doc. No. 2. On July 18, 2008, Godfrey filed a motion to suppress, Doc. No. 28, alleging statements he made to officers were coerced and involuntary "in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." Doc. No. 28-2, p. 2. The plaintiff (the "Government") resisted the motion on July 25, 2008. Doc. No. 30.

The Trial Management Order assigned motions to suppress to the undersigned to conduct any necessary evidentiary hearing, and to prepare a report on, and recommended disposition of, the motion. *See* Doc. No. 13, § IV.A. Accordingly, the court held a hearing on the motion on July 29, 2008, at which Assistant U.S. Attorney Forde Fairchild appeared on behalf of the Government, and Godfrey appeared with his attorney John P. Greer. Godfrey testified on his own behalf. The Government offered the testimony of ATF Special Agent Todd Monney, and Jim Thompson, who is Godfrey's parole officer in connection with the State of Iowa conviction. One exhibit was admitted into evidence, to-wit: a CD containing an audio recording of an interview of Godfrey on October 21, 2005, by ATF Special Agents Todd Monney and Zane Dodds. The motion is now fully submitted and ripe for review.

The following background facts are relevant to consideration of Godfrey's motion to suppress. Sometime in September 2005, Monney and Dodds approached Godfrey in the yard outside his home, a single-family residence, and asked him a few questions about his older brother, Laddie Godfrey. The agents told Godfrey that Laddie had been arrested, and they asked if Godfrey knew anything about his brother's activities. Godfrey indicated he sometimes hung around his brother, but he did not know much about his brother's arrest. The conversation lasted only a few minutes, and then the officers left. The witnesses basically agree on the facts of this encounter, and the Government does not plan to offer evidence at trial of statements Godfrey made during this first encounter.

The witnesses' testimony diverges regarding the agents' subsequent encounters with Godfrey. According to Godfrey, he had two further encounters with Monney and Dodds. He described his next encounter with the agents as follows. About a month after the first encounter, Godfrey had moved into a trailer, and he was sitting inside his trailer watching television. The front door and screen door both were open, and Monney and Dodds walked into his residence without knocking or asking permission to enter. They asked if Godfrey remembered them, and stated they were the ones "trying to help your brother out." Godfrey testified about an entire conversation that took place on this occasion, including the agents' statements that they had talked with Thompson, Godfrey's parole officer, mentioning Thompson by name. Godfrey also testified the agents indicated they knew Godfrey was doing well on parole, they did not want to have to arrest him while he was doing so well, and it would be in his best interests to cooperate with them and provide information about his brother's activities. Godfrey testified the agents were "strong" and "intimidating" during this encounter, and their statements scared him because he did not want to go back to jail. He told the agents he wanted to call and talk with his parole officer about whether or not he had to cooperate with them. Godfrey stated this conversation with the agents lasted only a few minutes, and it was not recorded. He

2

further testified that after the agents left, he called Thompson and talked to him, and Thompson indicated it would be a good idea for Godfrey to cooperate with the agents because if he got arrested, his parole would be violated.

Monney denies this second encounter ever took place, and denies the agents talked with Thompson at any time before they received Godfrey's motion to suppress. Monney testified the agents' next encounter with Godfrey was on October 21, 2005, at Godfrey's trailer. Godfrey agrees he talked with the agents on this date, but maintains this was his third encounter with the agents, not his second. Godfrey testified that on the 21st, Thompson arrived at his trailer for a surprise home inspection, something that is permitted by the terms of Godfrey's parole. Thompson left, and Godfrey and his one-year-old daughter were inside the trailer with the front door open, but the screen door closed. Only moments after Thompson left, Monney and Dodds approached the trailer and could see Godfrey inside, through the screen door. According to Godfrey, the agents opened the door and entered the trailer without invitation or permission. They stated they were there to get Godfrey's cooperation, and "threw" some papers down on the coffee table. Godfrey looked at the papers, which contained statements indicating others had implicated Godfrey in selling guns. The agents interviewed Godfrey for close to an hour, and the interview was recorded. *See* Gov't Ex. 1. Godfrey made incriminating statements during the interview. It is those statements Godfrey seeks to suppress.

Monney's version of the events differs substantially from Godfrey's. Monney testified the agents did not enter Godfrey's home without permission, and did not "throw papers down on the table," although he may have handed some papers to Godfrey at some point during the interview. He was not aware that Thompson had been at Godfrey's residence earlier that day for a home inspection, and he had never talked with Thompson prior to that date.

3

The recorded interview supports Monney's testimony that the agents only met with Godfrey twice, with the second visit occurring on October 21, 2005. The recording also substantiates Monney's testimony that the agents did not enter Godfrey's residence uninvited. The agents started the recorder as they got out of their car. At the beginning of the recording, it is possible to hear the agents walking as they approached the residence. Although very faint, it also is possible to hear Monney say, "Hi, can we come in?" Godfrey can be heard responding, but his response is unintelligible. Monney then replied, "This is not gonna take very long at all," and Godfrey responded, "I hope not." The agents then entered the trailer, greeted Godfrey's young daughter, and began talking with Godfrey.

The agents told Godfrey they had gone to his previous residence looking for him, but someone else was living in the house. Godfrey responded that he had just moved to the trailer the previous weekend. This contradicts Godfrey's testimony that the agents had been to the trailer on a previous occasion. In addition, Thompson testified Godfrey called him the same date as this interview – October 21, 2005 – because he was worried about his parole being violated. Nowhere in the recording can the agents be heard "throwing" papers down, intimidating Godfrey, or acting in an unprofessional manner.

Godfrey contends the agents entered his home without permission or invitation, and coerced him into making incriminating statements. The court finds the agents, in fact, entered Godfrey's home only after asking permission to do so, and Godfrey's statements were not "extracted by threats, violence, or direct or implied promises to such a degree that [his] will was overborne, and his capacity of self-determination critically impaired." *United States v. Jacobs*, 97 F.3d 275, 279 (8th Cir. 1996) (internal quotation marks, citation omitted).

Godfrey also argues the agents knew he had an attorney in connection with his state case, and they should have consulted with his attorney before "interrogating" Godfrey

about the events leading to the present charge.  He further argues the agents at all times considered him to be a suspect, not merely a witness, and they should have advised him of his *Miranda* rights before talking with him.  The court finds the agents did not "interrogate" Godfrey; they simply asked him some questions, in the course of an ongoing investigation, about his and his brother's activities related to firearms.  Godfrey had not been charged, he was not under arrest, and the interview did not take place in a custodial setting.  Under these circumstances Godfrey's sixth amendment right to counsel had not attached.  *See United States v. Dobbs*, 711 F.2d 84, 85-86 (8th Cir. 1983) (citing *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S. Ct. 711, 713, 50 L. Ed. 2d 714 (1977)).  Further, "*Miranda* warnings are required only where a person is deemed to be in custody." *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 713, 50 L. Ed. 2d 714 (1977)).

The undersigned finds no basis for suppression of Godfrey's statements, and respectfully recommends that his motion to suppress be denied.  Objections to this Report and Recommendation must be filed **by August 15, 2008**.  Responses to objections must be filed by **August 20, 2008**.

IMPORTANT NOTE:  Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **August 13 2008, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**.  If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 11th day of August, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT